**ERICA K. ZUNKEL**
California State Bar No. 229285
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: erica_zunkel@fd.org

Attorneys for Mr. Ortiz

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE THOMAS J. WHELAN)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 08CR0804-TJW |
| Plaintiff, | ) | DATE:     May 11, 2008 |
| | ) | TIME:     2:00 p.m. |
| v. | ) | |
| | ) | **STATEMENT OF FACTS AND** |
| JESUS JUAN MANUEL ORTIZ (2), | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES IN SUPPORT OF** |
| Defendant. | ) | **MOTIONS** |

**I.**

**STATEMENT OF FACTS**[1]

On March 5, 2008, at approximately 3:37 p.m., Mr. Ortiz entered the United States from Mexico through the Calexico West Port of Entry as the passenger of a 2003 Toyota Corolla driven by co-defendant Maria Lamug. In secondary inspection, officers discovered 10.60 kilograms of methamphetamine concealed inside the car's dashboard. Ms. Lamug and Mr. Ortiz were arrested and detained at the Port of Entry. Mr. Ortiz was advised by agents of his Miranda rights and invoked them. He allegedly made a "spontaneous statement" after his invocation that the government may seek to use against him at trial.

Mr. Ortiz is currently charged by way of indictment with Importation of Marijuana in violation of Title 21 U.S.C. §§ 952 and 960 and Possession of Marijuana with Intent to Distribute in violation of Title 21 U.S.C. § 841(a)(1). The indictment in the instant case was returned by the January 2007 grand jury. That

---

[1] Unless otherwise noted, the facts in this Statement of Facts are derived from government-produced discovery. Mr. Ortiz does not concede the accuracy of these facts and reserves the right to contest these facts at future proceedings.

1    grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11,

2    2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is

3    attached hereto as Exhibit A.  Judge Burns' instructions deviate from the instructions at issue in the major

4    Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2]

5            After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

6    responsibility, see Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden "from

7    judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

8    federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

9    at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

10   judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

11   though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

12   be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

13   because the grand jurors disagree with a proposed prosecution.

14           Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

15   to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

16           I've gone over this with a couple of people.  You understood from the questions and
             answers that a couple of people were excused, I think three in this case, because they could
17           not adhere to the principle that I'm about to tell you.

18   Id.  That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their

19   disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

20   view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

21   / / /

22   / / /

23   / / /

24   / / /

25   _____

26          [2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v.
     Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-
27   Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004) (Navarro-Vargas I);
     United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

28          [3]  See also id. at 20 ("You're all about probable cause.").

1  In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

2  grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See id.

3  at 20.[4]

4  Now, again, this emphasizes the difference between the function of the grand jury and the
   trial jury.  You're all about probable cause.  If you think that there's evidence out there that

5  might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
   you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*

6  *duty-bound to present evidence that cuts against what they may be asking you to do if*
   *they're aware of that evidence.*

7

8  Id. (emphasis added).  The district court later returned to the notion of the prosecutors and their duties,

9  advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will

10 be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See id. at 27.

11 These motions follow.

12 **II.**

13 **MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

14 Mr. Ortiz moves for the production by the government of the following discovery and for the

15 preservation of evidence.  This request is not limited to those items about which the prosecutor knows, but

16 includes all discovery listed below that is in the custody, control, care, or knowledge of any government

17 agency.  See generally Kyles v. Whitley, 514 U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032

18 (9th Cir. 1989).

19 1.  The Defendant's Statements.  The government must disclose to Mr. Ortiz *all* copies of any

20 written or recorded statements made by Mr. Ortiz; the substance of any statements made by Mr. Ortiz that the

21 government intends to offer in evidence at trial; any response by Mr. Ortiz to interrogation; the substance of

22 any oral statements that the government intends to introduce at trial and any written summaries of Mr. Ortiz's

23 oral statements contained in the handwritten notes of the government agent; any response to any Miranda

24 warnings that may have been given to Mr. Ortiz; and any other statements by Mr. Ortiz.  Fed. R. Crim. P.

25 16(a)(1)(A) and (B).  The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that

26 / / /

27 _____

28 [4] These instructions were provided in the midst of several comments that praised the
   United States attorney's office and prosecutors in general.

1    the government must reveal *all* Mr. Ortiz's statements, whether oral or written, regardless of whether the

2    government intends to make any use of those statements.

3        2.    <u>Arrest Reports, Notes and Dispatch Tapes</u>. Mr. Ortiz also specifically requests that all arrest

4    reports, notes and dispatch or any other tapes that relate to the circumstances surrounding her arrest or any

5    questioning, if such reports have not already been produced *in their entirety*, be turned over to him. This

6    request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in

7    which statements of Mr. Ortiz or any other discoverable material is contained. Mr. Ortiz includes in this

8    request any redacted portions of the Report of Investigation ("ROI") and any subsequent ROIs that the case

9    agent or any other agent has written. This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and (B) and

10    <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). <u>See also</u> <u>Loux v. United States</u>, 389 F.2d 911 (9th Cir. 1968). Arrest

11    reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution

12    reports pertaining to Mr. Ortiz are available under Fed. R. Crim. P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2

13    and 12(I). Preservation of rough notes is requested, whether or not the government deems them discoverable.

14        3.    <u>Brady Material</u>. Mr. Ortiz requests all documents, statements, agents' reports, and tangible

15    evidence favorable to him on the issue of guilt and/or that affects the credibility of the government's case.

16    Impeachment and exculpatory evidence both fall within <u>Brady's</u> definition of evidence favorable to the

17    accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

18        4.    <u>Any Information That May Result in a Lower Sentence</u>. As discussed above, any information

19    that may result in a more favorable sentence must also be disclosed pursuant to <u>Brady</u>, 373 U.S. 83. The

20    government must disclose any cooperation or attempted cooperation by Mr. Ortiz, as well as any information

21    that could affect any base offense level or specific offense characteristic under Chapter Two of the United

22    States Sentencing Commission Guidelines Manual ("Guidelines"). Also included in this request is any

23    information relevant to a Chapter Three adjustment, a determination of Mr. Ortiz's criminal history, or any

24    other application of the Guidelines.

25        5.    <u>The Defendant's Prior Record</u>. Evidence of a prior record is available under Fed. R. Crim.

26    P. 16(a)(1)(D). Mr. Ortiz specifically requests a complete copy of any criminal record.

27        6.    <u>Any Proposed 404(b) Evidence</u>. Evidence of prior similar acts is discoverable under

28    Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609. In addition, under Fed. R. Evid. 404(b),

1  "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

2  general nature . . .." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.

3  Sufficient notice requires the government to "articulate *precisely* the evidential hypothesis by which a fact of

4  consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d 822, 830

5  (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v. Brooke, 4 F.3d 1480,

6  1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

7       This includes any "TECS" records (records of prior border crossings) that the government intends

8  to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there is nothing

9  intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other

10  acts" evidence that the government must produce before trial.  United States v. Vega, 188 F.3d 1150, 1154-

11  1155 (9th Cir. 1999).  Mr. Ortiz requests that such notice be given *three weeks before trial* to give the defense

12  time to adequately investigate and prepare for trial.

13       7.    Evidence Seized.  Evidence seized as a result of any search, either warrantless or with a

14  warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

15       8.    Request for Preservation of Evidence.  The defense specifically requests that all dispatch

16  tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession,

17  custody, or care of the government and that relate to the arrest or the events leading to the arrest in this case

18  be preserved.  This request includes, but is not limited to, any samples of narcotics used to run any scientific

19  tests, all narcotics, the results of any fingerprint analysis, the vehicle involved in the case, Mr. Ortiz's personal

20  effects, and any evidence seized from Mr. Ortiz or any third party.  This request also includes any material

21  or percipient witnesses who might be deported or otherwise likely to become unavailable (e.g. undocumented

22  aliens and transients).

23       It is requested that the prosecutor be ordered to *question* all the agencies and individuals involved

24  in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to

25  inform those parties to preserve any such evidence.

26       9.    Henthorn Material.  Mr. Ortiz requests that the Assistant United States Attorney ("AUSA")

27  assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved

28  in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 437, 438 (1995) (holding that

"the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).  This request includes, but is not limited to, any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary action was ultimately recommended.  Mr. Ortiz further requests production of any such information at least *one week* prior to the motion hearing and two weeks prior to trial.  If the prosecutor is uncertain whether certain information should be disclosed pursuant to this request, this information should be produced to the Court in advance of the motion hearing and the trial for an *in camera* inspection.

10.    <u>Tangible Objects</u>.  Mr. Ortiz requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, that are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to Mr. Ortiz.  Fed. R. Crim. P. 16(a)(1)(E).  Specifically, Mr. Ortiz requests **color copies** of all photographs in the government's possession of the alleged narcotics and the vehicle in which the narcotics were found.  If the prosecutor does not wish to make these copies, Mr. Ortiz requests the opportunity to do so herself.

11.    <u>Expert Witnesses</u>.  Mr. Ortiz requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief.  Fed. R. Crim. P. 16(a)(1)(G).  This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s).  <u>See</u> <u>United States v. Duvall</u>, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general subject matters to be covered and failed to identify what opinion the expert would offer on those subjects).  This request includes, but is not limited to, disclosure of the qualifications of any government witness who will testify that he understands and/or speaks Spanish or any other foreign language that may have been used during the course of an interview with Mr. Ortiz or any other witness.

Mr. Ortiz requests the notice of expert testimony be provided at a minimum of *three weeks prior to trial* so that the defense can properly prepare to address and respond to this testimony, including obtaining

1    its own expert and/or investigating the opinions, credentials of the government's expert and obtain a hearing

2    in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho v. Carmichael

3    Tire Co., 526 U.S. 137, 119 S. Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine,

4    reliability and relevancy of expert testimony and such determinations may require "special briefing or other

5    proceedings").

6          12.   Impeachment Evidence.  Mr. Ortiz requests any evidence that any prospective government

7    witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has

8    made a statement favorable to Mr. Ortiz.  See Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable

9    under Brady, 373 U.S. 83.  See United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record);

10    Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

11          13.   Evidence of Criminal Investigation of Any Government Witness.  Mr. Ortiz requests any

12    evidence that any prospective witness is under investigation by federal, state or local authorities for any

13    criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

14          14.   Evidence of Bias or Motive to Lie.  Mr. Ortiz requests any evidence that any prospective

15    government witness is biased or prejudiced against Mr. Ortiz, or has a motive to falsify or distort his or his

16    testimony.  Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Strifler, 851 F.2d 1197.

17          15.   Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity.  Mr. Ortiz

18    requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any

19    prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired; and any

20    evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.

21    Strifler, 851 F.2d 1197; Chavis v. North Carolina, 637 F.2d 213, 224 (4th Cir. 1980).

22          16.   Witness Addresses.  Mr. Ortiz requests the name and last known address of each prospective

23    government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker,

24    716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); United

25    States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses).  Mr. Ortiz

26    also requests the name and last known address of every witness to the crime or crimes charged (or any of the

27    overt acts committed in furtherance thereof) who will *not* be called as a government witness.  United States

28    v. Cadet, 727 F.2d 1453 (9th Cir. 1984).

17.    <u>Name of Witnesses Favorable to the Defendant</u>.  Mr. Ortiz requests the name of any witness who made any arguably favorable statement concerning Mr. Ortiz or who could not identify him or who was unsure of his identity or participation in the crime charged.  <u>Jackson v. Wainwright</u>, 390 F.2d 288 (5th Cir. 1968); <u>Chavis</u>, 637 F.2d at 223; <u>Jones v. Jago</u>, 575 F.2d 1164, 1168 (6th Cir. 1978); <u>Hudson v. Blackburn</u>, 601 F.2d 785 (5th Cir. 1979), <u>cert</u>. <u>denied</u>, 444 U.S. 1086 (1980).

18.    <u>Statements Relevant to the Defense</u>.  Mr. Ortiz requests disclosure of any statement that may be "relevant to any possible defense or contention" that he might assert.  <u>United States v. Bailleaux</u>, 685 F.2d 1105 (9th Cir. 1982).  This includes grand jury transcripts that are relevant to the defense motion to dismiss the indictment.

19.    <u>Jencks Act Material</u>.  Mr. Ortiz requests production in advance of the motion hearing or trial of all material, including dispatch tapes, that the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.  A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1).  <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963); <u>see also</u> <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitutes Jencks material when an agent reviews notes with the subject of the interview); <u>see also</u> <u>United States v. Riley</u>, 189 F.3d 802, 806-808 (9th Cir. 1999).  Advance production will avoid the possibility of delay of the motion hearing or trial to allow Mr. Ortiz to investigate the Jencks material.  Mr. Ortiz requests pre-trial disclosure of such statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly any Jencks statements during cross-examination.

20.    <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), Mr. Ortiz requests all statements and/or promises, expressed or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information that could arguably be used for the impeachment of any government witnesses.

21.    <u>Agreements Between the Government and Witnesses</u>.  Mr. Ortiz requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and the

government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any immigration benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made or the advice not followed.

22.    <u>Informants and Cooperating Witnesses</u>.  Mr. Ortiz requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Ortiz.  The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense.  <u>Roviaro v. United States</u>, 353 U.S. 52, 61-62 (1957).  The government must disclose any information derived from informants that exculpates or tends to exculpate Mr. Ortiz.

23.    <u>Bias by Informants or Cooperating Witnesses</u>.  Mr. Ortiz requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  <u>Giglio</u>, 405 U.S. 150.  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

24.    <u>Personnel Records of Government Officers Involved in the Arrest</u>.  Mr. Ortiz requests all citizen complaints and other related internal affairs documents involving any of the immigration officers or other law enforcement officers who were involved in the investigation, arrest and interrogation of Mr. Ortiz. <u>See</u> <u>Pitchess v. Superior Court</u>, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these documents, defense counsel will be unable to procure them from any other source.

25.    <u>Training of Relevant Law Enforcement Officers</u>.  Mr. Ortiz requests copies of all written, videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement agencies involved in the case (United States Customs Service, Border Patrol, INS, Department of Homeland Security, etc.) to their employees regarding:  (a) the handling of vehicles suspected to be transporting contraband across the port of entry; (b) the referral to secondary inspection of persons within those vehicles; (c) the detention of individuals within those vehicles; (d) the search of those vehicles and the occupants of those vehicles, including the proper means of obtaining consent to search and what constitutes consent to search; (e) the informing of suspects of their Constitutional rights; (f) the questioning of suspects and witnesses.  Mr. Ortiz also requests all written or otherwise attainable information regarding the training

1  of Customs agents at ports of entry in California to detect or discover narcotics in vehicles entering the United

2  States, including any training offered to Border Patrol, INS, or officers of Homeland Security Department,

3  by the DEA or other law enforcement agencies or individuals.

4      26.    Performance Goals and Policy Awards.  Mr. Ortiz requests disclosure of information

5  regarding standards used for measuring, compensating or reprimanding the conduct of all law enforcement

6  officers involved in the case (Customs, Border Patrol, INS, etc.) to the extent such information relates to the

7  detection of contraband.  This request specifically includes information concerning performance goals, policy

8  awards, and the standards used by Customs for commending, demoting, or promoting agents for their

9  performance at the port of entry and their success or failure to detect illegal narcotics in general.

10      27.    Opportunity to Weigh, View and Photograph the Contraband.  Mr. Ortiz hereby requests an

11  opportunity to view, photograph, and weigh the contraband allegedly confiscated in this case.  A proposed

12  order is attached.

13      28.    DEA 7 Form.  Mr. Ortiz requests a copy of the DEA 7 form that should indicate the alleged

14  weight and purity of the contraband in this case.

15      29.    TECS Reports.  Mr. Ortiz requests all TECS reports, including reports pertaining to all

16  vehicle border crossings pertaining to the vehicle used in this case and any vehicles pertaining to Mr. Ortiz.

17  **Any prior border crossings are considered "other acts" evidence that the government must produce**

18  **before trial**.  Vega, 188 F.3d at 1154.  Mr. Ortiz also requests all TECS reports related to her personal border

19  crossings (in this car, on foot, or in another car).

20      30.    Reports of Scientific Tests or Examinations.  Pursuant to Fed. R. Crim. P. 16(a)(1)(F), Mr.

21  Ortiz requests disclosure and the opportunity to inspect, copy, and photograph the results and reports of all

22  tests, examinations, and experiments conducted upon the evidence in this case, including, but not limited to,

23  any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or

24  control of the government, the existence of which is known, or by the exercise of due diligence may become

25  known, to the attorney for the government, and that are material to the preparation of the defense or are

26  intended for use by the government as evidence in chief at the trial.

27      31.    Narcotics Detector Dog Information.  Mr. Ortiz moves for production of all discoverable

28  information about any Narcotics Detector Dogs (NDDs) used in this case, including information regarding:

1  (a) the qualifications of the NDDs and their handlers, (b) the training and experience of the NDDs and their

2  handlers, (c) the government's procedures regarding the treatment, training and rewarding of the NDDs,

3  (d) a detailed description of the exact method the NDDs in this case used to indicate an "alert" to contraband,

4  and (e) the location of the NDD and the vehicle when the NDD alerted, and (f) the NDD's reliability.

5      32.    Residual Request.  Mr. Ortiz intends by this discovery motion to invoke his rights to

6  discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

7  and laws of the United States.  This request specifically includes all subsections of Rule 16.

8      Mr. Ortiz requests that the government provide her and her attorney with the above requested

9  material at least three weeks before trial.

10                                  **III.**

11              **MOTION TO PRESERVE AND RE-WEIGH EVIDENCE**

12      Mr. Ortiz requests that this Court issue an order for the U.S. Government and its agents to preserve

13  the narcotic evidence in this case and to permit the defense attorney and his agents to re-weigh it without the

14  packaging.  Mr. Ortiz also requests the opportunity to view and photograph all physical evidence seized,

15  including personal effects, items found in the car, and the car itself.  For the Court's convenience, a proposed

16  order is attached at the end of these motions.

17                                  **IV.**

18                  **MOTION TO SUPPRESS STATEMENTS**

19  **A.**    **Introduction.**

20      The government bears the burden of demonstrating that a defendant's statement is voluntary and that

21  Miranda warnings were given prior to a custodial interrogation.  United States v. Harrison, 34 F.3d 886, 890

22  (9th Cir. 1994); see also United States v. Dickerson, 530 U.S. 428, 439-41 (2000) (discussing constitutional

23  underpinnings of Miranda v. Arizona, 384 U.S. 436, 444 (1966) and the need to safeguard "precious

24  Fifth Amendment rights"); see also 18 U.S.C. § 3501.  Unless and until the government meets this high

25  burden in this case, all of Mr. Ortiz's statements must be suppressed.

26  **B.**    **Local Rule Requiring Declaration Is Unconstitutional.**

27      Mr. Ortiz anticipates that the Court may consider denying him an evidentiary hearing on the ground

28  that he has not filed a declaration in this case pursuant to Criminal Local Rule 47.1(g), which provides that

1  a defendant must submit a declaration in support of his motion.  However, in this case, where it is the

2  constitutionality of utilizing Mr. Ortiz's statements against him that is at stake and a declaration would require

3  Mr. Ortiz to make even *more* statements, denying Mr. Ortiz a hearing on this ground would violate his

4  constitutional rights.

5       It is well-settled that "Congress may not legislatively supercede [the Supreme Court's] decisions

6  interpreting and applying the Constitution."  Dickerson v. United States, 530 U.S. 428, 437 (2000).  Since

7  Miranda rests on a constitutional foundation, id. at 438, no law or local court rule can constitutionally relieve

8  the government of its burden to prove that Mr. Ortiz voluntarily waived the Miranda protections.  See id.  In

9  light of the Supreme Court's decision in Dickerson, this Court's burden-shifting local rule is unconstitutional,

10  and therefore unenforceable.

11  **C.    The Government Must Demonstrate Compliance with *Miranda* in This Case.**

12        **1.    *Miranda* Warnings Must Precede Custodial Interrogation.**

13       The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a

14  custodial interrogation of Mr. Ortiz unless it demonstrates the use of procedural safeguards effective to secure

15  the privilege against self-incrimination.  Miranda v. Arizona, 384 U.S. 436, 444 (1966)[5].  Custodial

16  interrogation is questioning initiated by law enforcement officers after a person has been taken into custody

17  or otherwise deprived of his freedom of action in any significant way.  Id.  See Orozco v. Texas, 394 U.S. 324,

18  327 (1969).

19       Once a person is in custody, Miranda warnings must be given prior to any interrogation.  See

20  United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980).  Those warnings must advise the

21  defendant of each of his or her "critical" rights.  United States v. Bland, 908 F.2d 471, 474 (9th Cir.1990).

22  In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively

23  misleading.  United States v. San Juan Cruz, 314 F.3d 384, 387 (9th Cir. 2003).  The warning must be clear

24  and not susceptible to equivocation.  Id. (vacating illegal entry conviction where defendant was advised of

25  his administrative rights from an I-826 form and later advised of his Miranda rights).  If a defendant indicates

26

27

28        [5]  In Dickerson v. United States, 530 U.S. 428, 120 S. Ct. 2326 (2000), the Supreme Court
held that Miranda rights are no longer merely prophylactic, but are of constitutional dimension.  Id.
at 2336 ("we conclude that Miranda announced a constitutional rule").

1  that he wishes to remain silent or requests counsel, the interrogation must cease.  <u>Miranda</u>, 384 U.S. at 474;

2  <u>see also</u> <u>Edwards v. Arizona</u>, 451 U.S. 484 (1981).  Unless and until the government shows that the agents

3  properly administered the <u>Miranda</u> warnings, the government cannot use evidence obtained as a result of any

4  custodial interrogation that occurred after Mr. Ortiz's arrest.  <u>Miranda</u>, 384 U.S. at 479.

5  **2.    The Government Must Demonstrate That Any Alleged Waiver of Mr. Ortiz's Rights Was Voluntary, Knowing, and Intelligent.**

6

7  When interrogation occurs without the presence of an attorney and a statement is taken, a heavy

8  burden rests on the government to demonstrate that the defendant intelligently and voluntarily waived her

9  privilege against self-incrimination and her right to retained or appointed counsel.  <u>Miranda</u>, 384 U.S. at 475.

10  It is undisputed that, to be effective, a waiver of the right to remain silent and the right to counsel must be

11  made knowingly, intelligently, and voluntarily.  <u>Schneckloth</u>, 412 U.S. 218.  To satisfy this burden, the

12  prosecution must introduce evidence sufficient to establish "that under the 'totality of the circumstances,' the

13  defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to

14  abandon it." <u>United States v. Garibay</u>, 143 F.3d 534, 536 (9th Cir. 1998) (quoting <u>Moran v. Burbine</u>, 475 U.S.

15  412, 421 (1986)).  The Ninth Circuit has stated that "[t]here is a presumption against waiver."  <u>Garibay</u>,

16  143 F.3d at 536.  The standard of proof for a waiver of these constitutional rights is high.  <u>Miranda</u>, 384 U.S.

17  at 475.  <u>See</u> <u>United States v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is

18  great, the court must indulge every reasonable presumption against waiver of fundamental constitutional

19  rights).  Finally, it should be noted that, since <u>Miranda</u> rests on a constitutional foundation, <u>see</u> <u>Dickerson v.</u>

20  <u>United States</u>, 530 U.S. 428, 438 (2000), no law or local court rule relieves the government of its burden to

21  prove that Mr. Ortiz voluntarily waived the <u>Miranda</u> protections.  <u>Miranda</u>, 384 U.S. 475.

22  The validity of the waiver depends upon the particular facts and circumstances surrounding the case,

23  including the background, experience, and conduct of the accused.  <u>Edwards v. Arizona</u>, 451 U.S. 477, 472

24  (1981); <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1983).  <u>See also</u> <u>United States v. Heldt</u>, 745 F.2d at 1277;

25  <u>United States v. McCrary</u>, 643 F.2d 323, 328-29 (9th Cir. 1981).  In <u>Derrick v. Peterson</u>, 924 F.2d 813

26  (9th Cir. 1990), the Ninth Circuit confirmed that the issue of the validity of a <u>Miranda</u> waiver requires a two

27  prong analysis:  the waiver must be both (1) voluntary, and (2) knowing and intelligent.  <u>Id.</u> at 820.

28  / / /

1  The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry under the

2  [Fifth] Amendment . . .." Id.  The second prong, requiring that the waiver be "knowing and intelligent,"

3  mandates an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right

4  being abandoned and the consequences of the decision to abandon it." Id. at 820-21 (quoting Colorado v.

5  Spring, 479 U.S. 564, 573 (1987)).  This inquiry requires that the Court determine whether "the requisite level

6  of comprehension" existed before the purported waiver may be upheld. Id. Thus, "[o]nly if the 'totality of

7  the circumstances surrounding the interrogation' reveal *both* an uncoerced choice *and* the requisite level of

8  comprehension may a court properly conclude that the Miranda rights have been waived." Id. (quoting

9  Colorado v. Spring, 479 U.S. at 573) (emphasis in original) (citations omitted)).

10  The government bears the burden of demonstrating a meaningful Miranda waiver by a preponderance

11  of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986).  Moreover, this Court must "indulge every

12  reasonable presumption against waiver of fundamental constitutional rights." Schell v. Witek, 218 F.3d 1017,

13  1024 (9th Cir. 2000) (*en banc*) (citations omitted).  Unless and until the prosecution meets its burden of

14  demonstrating through evidence that adequate Miranda warnings were given and that Mr. Ortiz knowingly

15  and intelligently waived his rights, Mr. Ortiz's statements must be suppressed. Miranda, 384 U.S. at 479.

16  **D.    The Government Bears the Burden of Proving Mr. Ortiz's Statements Were Made**
       **Voluntarily.**

17

18  A defendant in a criminal case is deprived of due process of law if the conviction is founded upon

19  an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368,

20  387 (1964).  This is so even when the procedural safeguards of Miranda have been satisfied. Id. The

21  government bears the burden of proving by a preponderance of the evidence that a confession is voluntary.

22  Lego v. Twomey, 404 U.S. 477, 483 (1972).

23  In order to be voluntary, a statement must be the product of a rational intellect and free will.

24  Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne

25  in a particular case, the totality of the circumstances must be considered. Schneckloth, 412 U.S. at 226. Some

26  factors taken into account have included the youth of the accused, his lack of education, his low intelligence,

27  the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and

28  / / /

1  prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or

2  sleep. Id.

3       A confession is deemed involuntary whether coerced by physical intimidation or psychological

4  pressure. Townsend v. Sain, 372 U.S. 293, 307 (1962). "The test is whether the confession was extracted

5  by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the

6  exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States,

7  168 U.S. 532, 542-43 (1897)). See also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981). Until

8  the government meets its burden of showing all statements of Mr. Ortiz that it intends to use at trial were

9  voluntary, his statements must be suppressed as involuntary. 18 U.S.C. § 3501(a).

10 **E.**    **This Court Must Conduct An Evidentiary Hearing to Determine the Voluntariness of Mr. Ortiz's Statements.**

11

12      This Court must make a factual determination as to whether a confession was voluntarily given prior

13 to its admission into evidence. 18 U.S.C. § 3501(a). Where a factual determination is required, courts are

14 obligated by Federal Rule of Criminal Procedure 12 to make factual findings. See United States v. Prieto-

15 Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial

16 itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported

17 by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive

18 pleading. Under section 3501(b), this Court must consider "all the circumstances surrounding the giving of

19 the confession," including:

20     (1) the time elapsing between arrest and arraignment of the defendant making the
    confession, if it was made after arrest and before arraignment, (2) whether such defendant
21     knew the nature of the offense with which he was charged or of which he was suspected
    at the time of making the confession, (3) whether or not such defendant was advised or
22     knew that he was not required to make any statement and that any such statement could be

23     used against him, (4) whether or not such defendant had been advised prior to questioning
    of his right to the assistance of counsel, and (5) whether or not such defendant was without
24     the assistance of counsel when questioned and when giving such confession.

25 18 U.S.C. § 3501(b) ("section 3501(b)").

26      Without the presentation of evidence, this Court cannot adequately consider these statutorily

27 mandated factors and other important factors bearing on voluntariness. Accordingly, Mr. Ortiz requests that

28 / / /

1  this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence

2  of the jury, whether any statements made by Mr. Ortiz were voluntary.

3                                                      **V.**

4  ***APPRENDI V. NEW JERSEY* AND *BLAKELY V. WASHINGTON* REQUIRE**
   **THAT THIS COURT DISMISS THE INDICTMENT BECAUSE 21 U.S.C.**
5  **§§ 952 AND 960 ARE UNCONSTITUTIONAL**

6          Simply stated, Mr. Ortiz's Apprendi and Blakely challenge to 21 U.S.C. §§ 952 and 960 is that

7  Congress plainly intended the facts that determine the maximum sentence, drug type and quantity, to be

8  sentencing factors, not elements. See, e.g., United States v. Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001)

9  (en banc). Because that allocation conflicts with the requirements of the Fifth and Sixth Amendments as set

10  forth in Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 124 S. Ct. 2531 (2004),

11  the statutes are unconstitutional. Moreover, because courts cannot disturb Congress' choice of fact-finder,

12  see United States v. Jackson, 390 U.S. 570, 576 (1968) (courts cannot "return to the [jury] the ultimate duty

13  that Congress deliberately placed in other hands"), the statute cannot be saved.

14          In United States v. Buckland, 289 F.3d 558 (9th Cir. 2002) (en banc) (holding 21 U.S.C. § 841

15  constitutional), and United States v. Mendoza-Paz, 286 F.3d 1104 (9th Cir. 2002) (holding 21 U.S.C. § 960

16  constitutional), the Ninth Circuit Court of Appeals (the "Court") rejected this constitutional challenge by

17  concluding that §§ 841 and 960 are sufficiently ambiguous to permit application of the doctrine of

18  constitutional doubt.[6] See Buckland, 289 F.3d at 564-68; Mendoza-Paz, 286 F.3d at 1109-10. However, the

19  Supreme Court's subsequent opinion in United States v. Harris, 122 S. Ct. 2406 (2002), indicates that the

20  Court's opinions in both Buckland and Mendoza-Paz were wrongly analyzed and decided. "It is already well

21  established that where a Supreme Court decision has effectively undermined prior Ninth Circuit precedent,

22  [this Court is] free to reexamine those earlier cases to determine their continuing validity." United States v.

23  Maybusher, 735 F.2d 366, 371 n. 1 (9th Cir. 1984) (9th Cir. 1984) (citation and quotation omitted).

24          To begin, the Buckland panel relied solely on its view that § 841 did not explicitly state that judges

25  were to determine drug type and quantity by a preponderance of the evidence. See Buckland, 289 F.3d at 565

26

27  ────────────

28          [6] By nonetheless raising this challenge here, Mr. Ortiz asks this Court to decline to follow
   Ninth Circuit precedent so clearly in conflict with binding precedent of the Supreme Court.
   Furthermore, Mr. Ortiz specifically preserves this issue for future review.

1  ("[s]ection 841 is most striking for what it does not say"); accord Mendoza-Paz, 286 F.3d at 1110; but see

2  Harris, 122 S. Ct. at 2411 ("[t]he statute does not say in so many words whether brandishing is an element

3  or a sentencing factor, but the structure of the prohibition suggests it is the latter"). Accordingly, in an effort

4  to save the statutes, the Court felt free to backtrack on countless decisions holding that Congress clearly

5  intended drug type and quantity to be sentencing factors decided by a trial judge. See, e.g., United States v.

6  Lopez-Martinez, 725 F.2d 471, 475 (9th Cir. 1984) ("Under the statute, the violation is importing or

7  possessing a controlled substance. The difference between narcotic and non-narcotic controlled substances

8  is material only as to the applicable penalty") (emphasis added); accord United States v. Johnson,

9  130 F.3d 1420, 1428 (10th Cir. 1997) (affirming jury instruction that said only "controlled substance");

10 United States v. Lucien, 61 F.3d 366, 373 (5th Cir. 1995) ("The identity of the controlled substance as cocaine

11 base is not an element of the offense proscribed in the first sentence of section 844(a); nor is it an element of

12 the distribution offense denounced in section 841(a)(1)"); United States v. Williams, 876 F.2d 1521, 1251

13 (11th Cir. 1989) ("The nature and quantity of the controlled substance are relevant only to sentencing and do

14 not constitute elements of a lesser included offense").

15       The Buckland panel found support for its view that the lack of an explicit statement as to burden of

16 proof and allocation between judge and jury was "dispositive," id. at 565, in United States v. Brough,

17 243 F.3d 1078 (7th Cir. 2001), and United States v. Cernobyl, 255 F.3d 1215 (10th Cir. 2001). The panels

18 in Brough and Cernobyl, like the Buckland panels itself, perform no statutory analysis beyond observing that

19 § 841 does not explicitly allocate the issues of type and quantity to the judge to determine by a preponderance

20 of the evidence.[7]  See Brough, 243 F.3d at 1079; Cernobyl, 255 F.3d at 1219. Relying on these cases, the

21 Court in Buckland concluded "the emphasis on the statutory divide between 'elements' in § 841(a) and

22 'penalties' in § 841(b) is . . . unavailing." 289 F.3d at 565.

23       In Harris, the Supreme Court rejects Buckland's approach, noting, at the outset, that application of

24 traditional canons of statutory construction to determine whether Congress intended facts to be elements or

25 sentencing factors is the "threshold question." Harris, 122 S. Ct. at 2411. Therefore, contrary to the view

26

27  _____

28       [7]  This approach misapplies constitutional doubt analysis, which takes place "after, and not
before, [a statute's] complexities are unraveled." Almendarez-Torres v. United States, 523 U.S. 224,
238 (1998).

1    expressed in <u>Buckland</u> that "[t]he days of semantical hair splitting between 'elements of the offense' and

2    'sentencing factors' . . . are over," <u>Buckland</u>, 289 F.3d at 566, the Supreme Court reaffirmed the viability of

3    the statutory construction approach that it has followed since 1998.  <u>See</u> <u>Harris</u>, 122 S. Ct. 2406; <u>accord</u> <u>Carter</u>

4    <u>v. United States</u>, 530 U.S. 255, 273 (2000); <u>Castillo v. United States</u>, 530 U.S. 120, 123 (2000); <u>Jones v.</u>

5    <u>United States</u>, 526 U.S. 227 (1999); <u>Almendarez-Torres</u>, 523 U.S. at 238.  The type of statutory analysis

6    undertaken in <u>Harris</u>, as well as in <u>Castillo</u>, <u>Jones</u> and <u>Almendarez-Torres</u>, makes clear that Congress intended

7    drug type and quantity to be sentencing factors.  <u>See, e.g.</u>, <u>United States v. Promise</u>, 255 F.3d 150, 170-77

8    (4th Cir. 2001) (Luttig, J., concurring) (analyzing section 841 and collecting cases).  Post-<u>Apprendi</u>, the Court

9    has not performed that analysis, however, because of <u>Buckland</u>'s erroneous view that its "day" had come and

10   one.  As the Court's pre-<u>Apprendi</u> precedent makes clear, that analysis compels concluding that Congress

11   intended drug type and quantity to be sentencing factors.[8]

12         Perhaps most tellingly, <u>Harris</u> specifically rejects the notion that underlies <u>Buckland</u>, as well as

13   <u>Brough</u> and <u>Cernobyl</u>, that pre-<u>Apprendi</u> statutory interpretation cases have been "stripped" of "precedential

14   value" by "<u>Apprendi</u>'s reading of the Due Process Clause."  <u>Buckland</u>, 289 F.3d at 567; <u>but see</u> <u>Sanchez</u>,

15   269 F.3d at 1268 (observing that "[f]undamentally, <u>Apprendi</u> did not announce any new principles of statutory

16   construction," and holding that "'Congress decided that the elements of a § 841 offense do not include the

17   weight of the drugs'"); <u>Buckland</u>, 289 F.3d at 586 (Tashima, J., dissenting) (same).  <u>Harris</u> teaches that the

18   canon of constitutional doubt does not "embrace a dynamic view of statutory interpretation, under which the

19   text might mean one thing when enacted yet another if the prevailing view of the Constitution changed."

20   122 S. Ct. at 2413.  But that is precisely what <u>Buckland</u>, <u>Brough</u> and <u>Cernobyl</u> do:  each of those decisions

21   rejects, without explanation, the pre-<u>Apprendi</u> statutory interpretation of section 841.  <u>See, e.g.</u>, <u>United States</u>

22   <u>v. Nordby</u>, 225 F.3d 1053, 1058 (9th Cir. 2000) ("existing precedent in this circuit plainly states that Congress

23   did not intend drug quantity to be an element of the crime under 21 U.S.C. §§ 841 and 846") (citations

24   omitted); <u>United States v. Jackson</u>, 207 F.3d 910, 920 (7th Cir.), <u>vacated</u>, 121 S. Ct. 376 (2000),

25   <u>judgment reinstated</u>, 236 F.3d 886 (7th Cir. 2001) ("[i]t is apparent that Congress intended the type and

26

27   _____

28         [8]  In fact, in <u>Buckland</u> the government conceded that Congress intended drug type and
     quantity to be sentencing factors and that the statute was not subject to a contrary interpretation.
     <u>Buckland</u>, 289 F.3d at 564; <u>accord</u> <u>id.</u> at 586 (Tashima, J., dissenting).

1  quantity of the drugs distributed by a defendant convicted under section 841(a) to be determined at

2  sentencing"); United States v. Jones, 194 F.3d 1178, 1185-86 (1999), vacated, 530 U.S. 1271 (2000), rev'd,

3  235 F.3d 1231, 1236 (10th Cir. 2000) ("Because Congressional intent is evident from the plain language of

4  the statute, the doctrine of constitutional doubt, and in particular the constitutional doubt articulated in Jones,

5  [526 U.S. 227,] does not apply"); see also United States v. Grimaldo, 214 F.3d 967, 972 (8th Cir. 2000)

6  ("[t]he structure and plain language of [section 841] leave no doubt that drug quantity is a sentencing factor").[9]

7  Thus, Buckland, like Brough and Cernobyl, simply adopted a new "meaning" of section 841 because "the

8  prevailing view of the Constitution changed." Harris, 122 S. Ct. at 2413. Harris precludes this approach.

9  Id.

10      In short, the approach taken in Buckland and Mendoza-Paz has been thoroughly repudiated by Harris.

11  The Ninth Circuit must now assess the constitutionality of 21 U.S.C. §§ 841, 952, and 960 under Apprendi

12  in light of the statutory construction set forth by the Supreme Court in Harris, Carter, Castillo, Jones and

13  Almendarez-Torrez. As the Court's pre-Apprendi cases show, an honest assessment reveals that these statutes

14  are facially unconstitutional.

15  **VI.**

16  **IF THIS COURT UPHOLDS THE CONSTITUTIONALITY OF THE STATUTE,**
**THE INDICTMENT MUST NEVERTHELESS BE DISMISSED BECAUSE THE**

17  **GRAND JURY WAS NOT ASKED TO FIND THAT MR. ORTIZ *KNEW* THE**
**TYPE AND QUANTITY OF NARCOTIC THAT WAS INVOLVED IN THIS OFFENSE**

18

19      If this Court reinterprets the type and quantity of controlled substance to be offense elements or the

20  "functional equivalent" of offense elements that have to be alleged in the indictment, this Court must find that

21  the statute's *mens rea* is equally applicable to these new "elements." See United States v. X-Citement Video,

22  Inc., 513 U.S. 64 (1994); but see United States v. Carranza, 289 F.3d 634 (9th Cir. 2002). Not only must the

23  indictment allege the type and quantity of "controlled substance" involved in the offense, the indictment must

24  allege that the defendant knew the type and quantity involved. And, regardless of what this Court considers

25  the elements of his alleged offense, Mr.  has a right to a Grand Jury determination on each one. See

26  _____

27     [9] Although the Buckland majority insists that it was "the judiciary, not Congress, which
allocated the responsibility for determining drug quantity under §841 to the courts," 289 F.3d at 567,

28  Jackson, Jones, and Grimaldo make clear that it was Congressional intent, not judicial fiat, that
dictated that allocation.

1  United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999) ("The Fifth Amendment . . . requires that a

2  defendant be convicted only on charges considered and found by a grand jury."); see also id. (reversing

3  because the Ninth Circuit could "only guess whether the grand jury received evidence of, and actually passed

4  on, Du Bo's intent.") (emphasis added).  Thus, assuming that this Court upholds the constitutionality of

5  section 841, the grand jury should have found that Mr. Ortiz knew that approximately 50.62 kilograms of

6  marijuana were involved in this offense.  Because the grand jury made no such finding, this Court should

7  dismiss the indictment.

8  **VII.**

9  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S**
10  **INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN**
    **AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH**
    **AMENDMENT BY DEPRIVING MR. GONZALEZ OF THE TRADITIONAL FUNCTIONING**
11  **OF THE GRAND JURY**

12  **A.    Introduction.**

13  The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

14  instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See

15  Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto

16  as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue

17  in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

18  several ways.[10]  These instructions compounded Judge Burns's erroneous instructions and comments to

19  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

20  at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto

21  as Exhibit B.[11]

22  / / /

23  _____

24  [10]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v.
    Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-
25  Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United
26  States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

27  [11]  The transcript of the voir dire indicates that grand jurors were shown a video presentation
    on the role of the grand jury.  Mr. De Leon requests that the video presentation be produced.  See
28  United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand
    jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

1.    **Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. B at 3, 3-4, 5,[12] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"

---

[12]  See also id. at 20 ("You're all about probable cause.").

1    If the answer is "yes" to both of those, then the case should move forward. If the answer
     to either of the questions is "no," then the grand jury should not hesitate and not indict.
2

3    See Ex. C at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

4    term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

5    addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

6    committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

7    crime."

8         Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

9    in some unknown set of circumstances, they might decline to indict even where there was probable cause.

10   Because of the redactions of the grand jurors' names, Mr. De Leon will refer to them by occupation. One is

11   a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The

12   CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

13   an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration

14   cases. See id.

15        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

16   CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

17   district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

18   Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

19   simply not capable of expression in the context of grand jury service.

20        Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as
          the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to
21        a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States
          entitled to a fair judgment. If there's probable cause, then the case should go forward. *I*
22        *wouldn't want you to say,* "well, yeah, there's probable cause, but I still don't like what our
          government is doing. I disagree with these laws, so I'm not going to vote for it to go
23        forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell
          me that.
24

25   See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand

26   juror know that he would not want him or her to decline to indict in an individual case where the grand juror

27   "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See id.

28   Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made

manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to  deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

1    Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both

2    questions are answered in the affirmative, lead to an "obligation" to indict.

3            Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

4    paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

5    to indict in every case in which there was probable cause.

6            The Court: Do you think you'd be inclined to let people go in drug cases even though you
             were convinced there was probable cause they committed a drug offense?
7            REA: It would depend on the case.
             The Court: Is there a chance that you would do that?
8            REA: Yes.
             The Court: I appreciate your answers.  I'll excuse you at this time.
9

10   Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

11   political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

12   should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

13   indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge Burns

14   made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

15   hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

16   because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[13]

17   See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great

18   a risk to run.

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   _____

25           [13] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate
     judge will have determined the existence of probable cause "in most circumstances" before it had
26   been presented with any evidence.  See Ex. B at 6.  This instruction created an imprimatur of finding
     probable cause in each case because had a magistrate judge not so found, the case likely would not
27   have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it
     merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction
28   made the grand jury more inclined to indict irrespective of the evidence presented.

**2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. B at 20.[14]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

/ / /

---

[14] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. B at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. C at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. B at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. C at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex. B at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1    The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that

2    "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. C at 14, Judge Burns

3    gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something

4    adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that." See id.  Thus,

5    Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

6    "adverse" or "that cuts against the charge." See id.

7    **B.    _Navarro-Vargas_ Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

9    The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

10   grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth

11   Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

12   approach[15] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

13   the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

14   jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January

15   2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

16   bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

17   exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

18   States v. Williams, 504 U.S. 36, 49 (1992).

19   For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

20   II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

21   deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

22   as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

23   (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

24   I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

25   prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

26   ─────────────

27   [15]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

2  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

3  prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of

4  the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

5  "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

6  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

7  § 15.2(g) (2d ed. 1999)).

8        Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

9  in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

10        The grand jury thus determines not only whether probable cause exists, but also whether
       to "charge a greater offense or a lesser offense; numerous counts or a single count; and
11       perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis
       of the same facts. And, significantly, the grand jury may refuse to return an indictment
12       even "'where a conviction can be obtained.'"

13  Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of

14  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

15  not only the initial decision to indict, but also significant questions such as how many counts to charge and

16  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

17  crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II

18  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

19  to indict someone even when the prosecutor has established probable cause that this individual has committed

20  a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,

21  dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

22  dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

23  But not in Judge Burns's instructions.

24  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established
       in Both _Vasquez_ and _Navarro-Vargas II_.**

25

26        The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

27  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

28  in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every

finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. C at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. C at 4, 8, n context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. C at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[16]  Jurors are not presumed to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

**(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want you to say, "Well, yeah, there's probable cause.  But I still don't like what the government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if   you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

---

[16]  This argument does not turn on Mr. Gonzalez's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    <u>See</u> Ex. C at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

2    juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

3    "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  <u>See id.</u> ("I

4    wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

5    was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

6    the exercise of discretion by any other prospective grand juror.

7    **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is

8    an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

9    Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

10   You'd have a similar *obligation* as a grand juror even though you might have to grit your
     teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote
11   against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote
     against criminalizing some drugs.

12
     That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and
13   to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that
     a crime was committed?  Yes.  Does it seem to me that this person's involved? It does."
14   *And then your obligation, if you find those things to be true, would be to vote in favor of
     the case going forward*.

15

16   <u>Id.</u> at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

17   were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

18   convinced there was probable cause they committed a drug offense?" <u>Id.</u> at 27.  The potential juror responded:

19   "It would depend on the case." <u>Id.</u>  Nevertheless, that juror was excused.  <u>Id.</u> at 28.  Again, in this context, and

20   contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the juror has no

21   prerogative to do anything other than indict if there is probable cause.

22   Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

23   a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

24   rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

25   indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

26   prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

27   scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

28   prospective jurors, because his message is that there is no discretion not to indict.

**(3)**     As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."  See id. at 61.

**(4)**     And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. B at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.*  We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

1  contradiction of the Supreme Court's decision in <u>Vasquez</u>. Indeed, it defies credulity to suggest that a grand

2  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

3  <u>Vasquez</u>:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

8  474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

9  dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

10  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

11  charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor

12  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u>

13  <u>id.</u> at 264. Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury. The instructions therefore represent

14  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

15  jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

16  therefore be dismissed. <u>Id.</u>

17      The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

18  instructions excesses. The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

19  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

20  408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand

21  jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at

22  1202 (emphases in the original).

23      Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

24  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

25  of many of its decisions -- sufficiently protects that power." <u>See id.</u> at 1214 (Hawkins, J., dissenting). The

26  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

27  making a probable cause determination ... unconstitutionally undermines the very structural protections that

28  the majority believes save[] the instruction." <u>Id.</u> After all, it is an "'almost invariable assumption of the law

1   that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

2   "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

3   in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

4   instructions because nothing will happen if they disobey them."  Id.

5          In setting forth Judge Hawkins' views, Mr. Ortiz understands that this Court may not adopt them

6   solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

7   Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.  Here, again,

8   the question is not an obscure interpretation of the word "should", especially in light of the instructions and

9   commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-

10  Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse

11  to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-

12  Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

13         Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

14  they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

15  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See Ex.

16  B at 8; Ex. C at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

17  grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

18  of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

19  exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government

20  by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &

21  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

22  initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

23  Burns has both fashioned his own rules and enforced them.

24  **D.      The Instructions Conflict with Williams' Holding That There Is No Duty to Present**
    **Exculpatory Evidence to the Grand Jury.**

25

26         In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

27  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

28  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

1    common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory'

2    judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority

3    "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

4    amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

5    Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does

6    not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47

7    (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative,

8    rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's claim, both

9    as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

10    Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

11    present to them evidence that tended to undercut probable cause. See Ex. B at 20.

12    Now, again, this emphasizes the difference between the function of the grand jury and the
     trial jury. You're all about probable cause. If you think that there's evidence out there that

13    might cause you say "well, I don't think probable cause exists," then it's incumbent upon
     you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*

14    *duty-bound to present evidence that cuts against what they may be asking you to do if*
     *they're aware of that evidence.*

15

16    Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their

17    duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

18    [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

19    id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See

20    Navarro-Vargas, 408 F.3d at 1207.

21    This particular instruction has a devastating effect on the grand jury's protective powers, particularly

22    if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

23    conveyed by the previous instruction: "You're all about probable cause." See Ex. B at 20. Thus, once again,

24    the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

25    probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

26    would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they

27    should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

28    will present it. The end result, then, is that grand jurors should consider evidence that goes against probable

cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. C at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. B at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## VIII.

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Defense counsel for Mr. Ortiz has received only 48 pages of discovery. He believes that discovery is not yet complete. Furthermore, defense counsel has not yet had an opportunity to examine and re-weigh

1  the drugs at issue in this case or to view the vehicle seized and Mr. Ortiz's personal effects.  Mr. Ortiz

2  respectfully requests leave to file further motions based on information obtained through the discovery

3  process.

**IX.**

**CONCLUSION**

6          For the foregoing reasons, Mr. Ortiz respectfully requests that the Court grant the above motions.

Respectfully submitted,

9  DATED:          April 28, 2008                    /s/ Erica K. Zunkel
                                                     **ERICA K. ZUNKEL**
10                                                   Federal Defenders of San Diego, Inc.
                                                     Attorneys for Mr. Ortiz